UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH ZAPPIA,

Plaintiff,

v.

RADIUS GLOBAL INFRASTRUCTURE, INC., WILLIAM H. BERKMAN, MICHAEL D. FASCITELLI, NOAM GOTTESMAN, WILLIAM D. RAHM, PAUL A. GOULD, ANTOINETTE COOK BUSH, THOMAS C. KING, NICK S. ADVANI, and ASHLEY LEEDS,

Defendants.

Case No. 23-cv-04076

**COMPLAINT FOR (I) VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND (II) BREACHES OF FIDUCIARY DUTY UNDER DELAWARE LAW**

**JURY TRIAL DEMANDED**

Plaintiff Joseph Zappia ("Plaintiff"), by the undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to Plaintiff's own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by Plaintiff's attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

## NATURE OF THE ACTION

1. This action is brought by Plaintiff against Radius Global Infrastructure, Inc. ("Radius" or the "Company") and the members of the Company's Board ("Board") for (i) violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"), and (ii) breaches of fiduciary duties under Delaware law. Plaintiff's claims arise in connection with the solicitation of public stockholders of Radius to, *inter alia*, vote in favor of a merger transaction ("Merger") pursuant to

which Radius will merge into affiliates of EQT Partners, Inc. ("EQT") and Public Sector Pension Investment Board ("PSP"), in exchange for payment of $15.00 per share in cash by EQT and PSP to Radius stockholders.

2. On March 1, 2023, Radius announced that the Board had approved the sale of the Company to EQT and PSP for $15.00 per share in cash ("Merger Consideration"), pursuant to a merger agreement ("Merger Agreement").

3. On May 12, 2023, Defendants authorized the filing of a false and misleading definitive proxy on Schedule 14A ("Proxy") with the SEC with the aim of soliciting Radius stockholders to vote for the Merger. As detailed below, the Proxy contains material misrepresentations and omissions, and therefore (i) violates Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, and (ii) constitutes a breach of the Board's fiduciary duties under Delaware law.

4. The Proxy advises that a special meeting of Radius stockholders will be held on June 15, 2023, to vote on the Merger ("Stockholder Vote").

5. The material misrepresentations and omissions in the Proxy must be cured in advance of the Stockholder Vote to enable Radius stockholders to cast informed votes with respect to the Merger. Therefore, Plaintiff seeks to enjoin the Defendants from taking any further steps to consummate the Merger and schedule the Stockholder Vote, until such violations are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover damages suffered by Plaintiff and other Radius stockholders as a result of such violations, and/or seek other appropriate relief.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction). The Court has subject matter jurisdiction over the claims for breach of fiduciary duty under Delaware law under 28 U.S.C. § 1367 (providing supplemental jurisdiction over all other claims that are related to claims in the action within the Court's original jurisdiction).

7. This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiff's securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig*., No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

8. Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, the Company's common stock trades under the ticker "RADI" on Nasdaq, which is headquartered in this District, and the false and misleading Proxy was filed with

the SEC, which has a regional office in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution appropriate in District).

**PARTIES**

9. Plaintiff is and has been a stockholder of Radius common stock at all relevant times.

10. Defendant Radius is a Delaware corporation with its principal executive offices located at 3 Bala Plaza East, Suite 502 Bala Cynwyd, PA 19004. Radius owns real properties leased to wireless operators, wired operators, wireless tower companies, and other digital infrastructure operators.

11. Defendant William H. Berkman presently serves as Co-Chairman of the Board and Chief Executive Officer ("CEO") of Radius, and has served as a member of the Board at all relevant times.

12. Defendant Michael D. Fascitelli presently serves as Co-Chairman of the Board, and has served as a member of the Board at all relevant times.

13. Defendant Noam Gottesman has served as a member of the Board at all relevant times.

14. Defendant William D. Rahm has served as a member of the Board at all relevant times.

15. Defendant Paul A. Gould has served as a member of the Board at all relevant times.

16. Defendant Antoinette Cook Bush has served as a member of the Board at all relevant times.

17. Defendant Thomas C. King has served as a member of the Board at all relevant times.

18. Defendant Nick S. Advani has served as a member of the Board at all relevant times.

19. Defendant Ashley Leeds has served as a member of the Board at all relevant times.

20. Defendants identified in paragraphs 11 to 19 are collectively referred to herein as the "Individual Defendants," and together with Radius, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS[1]

### Negotiation of the Merger With EQT and PSP

21. In April 2022, ten potential counterparties to a transaction with the Company signed new or amended non-disclosure agreements with the Company. Signing a non-disclosure agreement was a condition for a potential counterparty to gain access to a virtual data room containing information about the Company.

22. Beginning in mid-May 2022, in connection with a potential sale of the Company, eight potential counterparties (identified as EQT, PSP, Party A, Party B, Party C, Party E, Party H, and Party I) were provided access to a virtual data room that contained information about the Company.

23. On May 24, 2022, the Board authorized and created the Transaction Committee, which was empowered with full authority to review, consider, evaluate, negotiate, accept, reject and recommend any potential transaction in which one or more officers, directors, stockholders or affiliates of the Company may have material interests that would be additional to and/or materially different from the interests of disinterested Company stockholders. The Proxy discloses that the

[1] Any emphasis in quoted language is added, unless otherwise noted.

Board appointed Defendant King as chair of the Transaction Committee, and that Defendant Leeds was a member of the Transaction Committee, but fails to disclose which if any of the other members of the Board served on the Transaction Committee. The Proxy also fails to disclose whether any members of the Transaction Committee received compensation for their service on the Transaction Committee.

24. The Transaction Committee retained Barclays Capital Inc. ("Barclays") as its financial advisor. The Proxy fails to disclose, however, that Defendant King—the Chair of the Transaction Committee—formerly served as Chief Executive Officer of Investment Banking at Barclays and Chairman of Barclays' Investment Banking Executive Committee, and was also a member of the Barclays Group Executive Committee, which oversees all of the Barclays plc businesses.

25. The Board retained Goldman Sachs & Co. LLC ("Goldman") and Citibank Global Markets Inc. ("Citi") as its financial advisors. The Proxy fails to disclose, however, that Defendant Advani formerly served at Goldman as a Partner and Managing Director where he led the European arm of Goldman Sachs Investment Partners, a multi-strategy hedge fund investing on behalf of the firm and its clients.

26. On June 6, 2022, the Transaction Committee adopted guidelines ("June 2022 Guidelines") to govern discussions between potential counterparties to a sale of the Company, on the one hand, and Company management, on the other hand, concerning Company management's willingness to enter into equity rollover arrangements and/or post-closing employment and compensation arrangements. Having disclosed the existence of the June 2022 Guidelines, however, the Proxy fails to disclose any of the guidelines. In particular, it is unclear (i) whether the June 2022 Guidelines authorized discussions concerning the terms of equity rollover

arrangements and/or post-closing employment and compensation arrangements between Company management and a potential acquiror, even before certain material terms of a transaction with such acquiror had been agreed upon; (ii) to the extent the June 2022 Guidelines restricted discussions concerning the terms of equity rollover arrangements and/or post-closing employment and compensation arrangements between Company management and a potential acquiror, before certain material terms of a transaction with such acquiror had been agreed upon, what were the material terms that had to be first be agreed upon before such discussions could proceed, and (iii) whether the Transaction Committee, the Board, or both, had the power under the June 2022 Guidelines to consent to such discussions between Company management and a potential acquiror.

27. On August 11, 2022, Company management was informed that the Transaction Committee had authorized initial contact between Company management, on the one hand, and representatives of each of EQT and a second bidder, Party C, on the other hand, subject to compliance with the June 2022 Guidelines, for purposes of limited discussions regarding certain members of Company management's interest in remaining with the Company after the closing of a sale and willingness to rollover any portion of their equity in the Company in connection with a sale.

28. On August 17, 2022, EQT advised Citi that it was no longer pursuing an acquisition of Radius.

29. On August 18, 2022, Party C submitted a revised written proposal to acquire the Company for $17.00 per share in cash.

30. On September 2, 2022, the Transaction Committee consented to representatives of Party C and Party C's outside counsel having high-level discussions with certain members of Company management and their respective outside counsel, subject to compliance with the June

2022 Guidelines, regarding the potential terms of rollover arrangements and post-closing employment and compensation arrangements that such individuals would consider in connection with a transaction with Party C. Notably, at that time, the material terms of a transaction with Party C had *not* yet been agreed upon.

31. On September 7, 2022, members of Company management, Defendant Leeds, and several of the Board's and Transaction Committee's advisors, on the one hand, and representatives of Party C, on the other hand, met for dinner in New York City for introductory purposes. Thereafter, during the rest of September 2022 and October 2022, Party C and Party C's outside counsel, on the one hand, and certain members of Company management and their respective counsel, on the other hand, discussed the structure and principal terms of potential rollover arrangements.

32. On September 26, 2022, EQT did an about face, and submitted a non-binding written proposal to acquire the Company for $16.00 per share in cash.

33. On October 4, 2022, Party C submitted a revised written proposal to acquire the Company for $12.00 per share in cash.

34. On November 4, 2022, EQT submitted a revised written proposal to acquire the Company for $14.25 per share in cash.

35. On November 14, 2022, EQT submitted a revised proposal to acquire the Company for cash in the range of $14.75 to $15.25 per share.

36. On November 22, 2022, EQT advised Citi that it was prepared to acquire the Company for $15.00 per share in cash.

37. On December 7, 2022, the Board directed Company management and its financial and legal advisors to continue engaging with EQT in an effort to resolve the "key open points" on

the Merger Agreement *prior to consenting*, in accordance with the June 2022 Guidelines, to EQT beginning discussions with certain members of Company management on their rollover arrangements and post-closing employment and compensation arrangements. As noted above, however, on September 2, 2022, the Transaction Committee had consented to representatives of Party C and Party C's outside counsel having high-level discussions with certain members of Company management and their respective outside counsel, subject to compliance with the June 2022 Guidelines, regarding potential terms of rollover arrangements and post-closing employment arrangements that such individuals would consider in connection with a transaction with Party C, even though at that time the material terms of a transaction with Party C had *not* yet been agreed upon.

38. On December 14, 2022, Defendant Berkman, in accordance with the June 2022 Guidelines, held a telephone call with a representative of EQT to indicate that based on the parties' resolution of "certain of the discrete issues" in the Merger Agreement, Company management would be requesting consent from the Transaction Committee to authorize discussions between EQT and certain members of Company management regarding such individuals' potential rollover arrangements and potential post-closing compensation arrangements.

39. On December 15, 2022, the Transaction Committee consented to EQT discussing with certain members of Company management the terms of rollover arrangements and their post-closing employment and compensation arrangements. Thereafter between mid-December 2022, and February 2023, Defendant Berkman—as well as Scott G. Bruce (the Company's President), Richard I. Goldstein (the Company's Chief Operating Officer), and Glenn J. Breisinger (the Company's Chief Financial Officer and Treasurer)—engaged in negotiations with EQT concerning the terms of equity rollover arrangements, a post-closing management incentive equity

plan, and post-closing employment and compensation arrangements. The Proxy discloses that the principal economic terms of the equity rollover arrangements, and post-closing employment and compensation arrangements, between EQT, on the one hand, and Defendant Berkman, Mr. Bruce, Mr. Goldstein, and Mr. Breisinger, on the other hand, were substantially agreed upon.

40. On March 1, 2023, the Transaction Committee met, and Barclays rendered its opinion ("Barclays Fairness Opinion") that the Merger Consideration was fair to the holders of the Company's Class A Common Stock (other than the executive officers of the Company and two of the Company's principal stockholders, TOMS Acquisition II LLC and Imperial Landscape Sponsor LLC (the "Excluded Stockholders")). Thereafter, the Transaction Committee unanimously adopted resolutions recommending that the Board approve the Merger Agreement and the proposed transaction with EQT and PSP.

41. Later on March 1, 2023, the Board met, and Citi and Goldman rendered their respective opinions (the "Citi Fairness Opinion" and the "Goldman Fairness Opinion") that the Merger Consideration was fair to the holders of the Company's Class A Common Stock. Thereafter, the Board unanimously approved the Merger and resolved to recommend that Radius stockholders approve the Merger.

42. Later that same day, the Company issued a press release announcing the Merger.

**<u>The Proxy Contains Material Misrepresentations and Omissions</u>**

43. Defendants disseminated a false and misleading Proxy to Radius stockholders that misrepresents or omits material information, and thus deprives Plaintiff and other Radius stockholders of their right to cast informed votes with respect to the Merger.

***Material Omissions Concerning the Membership of the Transaction Committee***

44. With respect to conflicts affecting board members, "the relevant inquiry is not whether an actual conflict of interest exists, but rather whether full disclosure of potential conflicts of interest has been made." *Wilson v. Great Am. Indus., Inc*., 855 F.2d 987, 994 (2d Cir. 1988). The existence of potential conflicts affecting committee members tasked with managing a sales process is particularly important since such conflicts could plausibly result in committee members negotiating for a less than optimal price because of extraneous considerations related to the conflict. Accordingly, a proxy must disclose the identity of committee members tasked with managing a sales process. Such disclosure is material since it enables stockholders to determine the existence of potential conflicts. *Chen v. Select Income REIT*, 2019 WL 6139014, at *2, 13 (S.D.N.Y. Oct. 11, 2019) (identities of Committee members not disclosed; missing information was material for purposes of identifying conflicts of interest); *van der Fluit v. Yates*, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) ("The vague language regarding the identities of the negotiators prohibited Opower stockholders from determining the interests of those fiduciaries who negotiated the deal on behalf of the stockholders, which I find to be a material disclosure violation.")

45. Here, the Proxy discloses that the Transaction Committee was empowered "with full authority to review, consider, evaluate, negotiate, accept, reject and recommend any potential transaction in which one or more officers, directors, stockholders or affiliates of the Company may have material interests that would be additional to and/or materially different from the interests of disinterested Company stockholders." Indeed, the Board approved the Merger upon the recommendation of the Transaction Committee.

46. The Proxy further discloses that the Board appointed Defendant King as chair of the Transaction Committee, and mentions in passing that Defendant Leeds was a member of the Transaction Committee. The Proxy, however, never purports to describe the full membership of the Transaction Committee, and thus it remains unclear whether any of the other members of the Board besides Defendants King and Leeds served on the Transaction Committee. The Proxy also fails to disclose whether any members of the Transaction Committee received compensation for their service on the Transaction Committee in an amount or form that might give rise to a potential conflict. The full membership of the Transaction Committee must be disclosed.

***Material Omissions Concerning Potential Conflicts Affecting Barclays and Goldman***

47. Because of the central role played by financial advisors in negotiating transactions, both federal and Delaware law require full disclosure of potential (not just actual) conflicts affecting such advisors. That is, "the relevant inquiry is not whether an actual conflict of interest exists, but rather whether full disclosure of potential conflicts of interest has been made." *Wilson*, *supra*. Without full disclosure concerning even potential conflicts affecting financial advisors, stockholders are unable to understand what factors might have influenced the financial advisor's analytical efforts in preparing a fairness opinion, and are therefore unable to cast informed votes. With full disclosure of potential conflicts affecting financial advisors, shareholders can judge for themselves what significance to attribute to potential conflicts that might have undermined the loyalty of such advisors in representing shareholders in connection with a merger. When a financial advisor faces a potential conflict, the law requires not just disclosure of the conflicting relationship itself, but also the amount of fees the advisor received in connection with such relationship.

48. Here, the Transaction Committee retained Barclays as its financial advisor. The Proxy fails to disclose, however, that Defendant King—the Chair of the Transaction Committee—

formerly served as Chief Executive Officer of Investment Banking at Barclays and Chairman of Barclays' Investment Banking Executive Committee, and was also a member of the Barclays Group Executive Committee, which oversees all of the Barclays plc businesses. Defendant King's prior senior leadership position with Barclays poses a potential conflict that plausibly could have affected Barclays' analytical efforts and must therefore be disclosed so that Radius stockholders can weigh for themselves the significance of this potential conflict.

49. Further, the relationship disclosures provided by Barclays together with its Fairness Opinion state that "Barclays and its affiliates in the past have provided, currently are providing, or in the future may provide, investment banking services to the Excluded Stockholders and have received or in the future may receive ***customary fees for rendering such services***." The phrase "customary fee," however, does not provide meaningful insight to stockholders as to a banker's incentives, and thus a proxy must disclose the amount of such fees. *Continuum Cap. v. Nolan*, C.A. No. 2011-5687-VCL, at 97 (Del. Ch. Feb. 3, 2011) (TRANSCRIPT); *Ortsman v. Green*, 2007 WL 702475, at *1-2 (Del. Ch. Feb. 28, 2007).

50. Here, the "Excluded Stockholders"— TOMS Acquisition II LLC and Imperial Landscape Sponsor LLC—are principal stockholders of the Company, owning 5% and 2.7% of the Company, respectively, as of March 24, 2023. To the extent Barclays has provided, and continues to provide services to such entities, that poses a potential conflict, and the Proxy must disclose the amount of fees paid by such entities to Barclays.

51. Finally, the Board retained Goldman as one of its financial advisors. The Proxy fails to disclose, however, that Defendant Advani formerly served at Goldman as a Partner and Managing Director where he led the European arm of Goldman Sachs Investment Partners, a multi-strategy hedge fund investing on behalf of the firm and its clients. Defendant Advani's prior senior

leadership position with Goldman poses a potential conflict that plausibly could have affected Goldman's analytical efforts and must therefore be disclosed so that Radius stockholders can weigh for themselves the significance of this potential conflict.

***Material Omissions Concerning the Non-Disclosure Agreement Signed With Parties H and L***

52. A proxy must disclose material restrictions on bidders such as standstill provisions in confidentiality agreements, including whether potential acquirers were precluded from bidding by "Don't Ask, Don't Waive" ("DADW") provisions. Such disclosure is required because, in deciding how to vote with respect to a transaction, it is important for stockholders to know whether other potential counterparties were precluded from submitting a topping bid after a board announces a transaction with a particular bidder.

53. Here, the Proxy discloses that eight out of the ten non-disclosure agreements signed by the Company with potential counterparties in April 2022 contained standstill provisions that fell away in the event the Company announced a transaction. The Proxy also makes clear that signing a non-disclosure agreement with the Company was a condition to a counterparty receiving access to a virtual data room containing information about the Company.

54. The Proxy does not indicate that Party H was among the counterparties that signed a non-disclosure agreement with the Company in April 2022. But Party H was given access to a virtual data room beginning in mid-May 2022, which means that Party H signed a non-disclosure agreement with the Company. The Proxy fails to disclose, however, whether the non-disclosure agreement signed with Party H contained a standstill provision, and if such standstill provision fell away in the event the Company announced a transaction. This omission is material because, on June 7, 2022, Party H indicated to representatives of Citi and Goldman that it intended to submit a written proposal to acquire the Company. While the Company ultimately did not receive any

written proposal from Party H, Radius stockholders would consider it important to know whether Party H was precluded from submitting a topping bid after the Merger was announced given Party H's prior indication of interest in submitting a bid.

55. Party L first contacted Defendant Berkman on November 14, 2022, and signed a non-disclosure agreement with the Company on January 3, 2023. Thereafter, Party L engaged in due diligence, including securing limited access to the virtual data room containing information about the Company. The Proxy states that Party L ceased engaging with the Company after a meeting between Company L and its advisors, and Company management and its advisors, on January 20, 2023.

56. The Proxy fails to disclose, however, whether the non-disclosure agreement signed with Party L contained a standstill provision, and if such standstill provision fell away in the event the Company announced a transaction. This omission is material because while the Company did not receive a written proposal from Party L, Party L had conducted extensive due diligence, and thus Radius stockholders would consider it important to know whether Party L was precluded from submitting a topping bid after the Merger was announced.

***Material Omissions Concerning the Contents of the June 2022 Guidelines***

57. In deciding how to vote, stockholders consider it important to be made aware of discussions concerning equity rollovers and post-merger employment and compensation arrangements between an acquiror and directors and officers of the target that occurred *before* the material terms of a deal with the acquiror have been agreed upon since the prospect of opportunities to roll over equity, and/or lucrative post-merger compensation and employment, represent an economic motivation that could lead a director or officer to negotiate a deal at a less than optimal price.

58. Here, on June 6, 2022, the Transaction Committee adopted the June 2022 Guidelines to govern discussions between potential counterparties to a sale of the Company, and Company management, concerning Company management's willingness to enter into any potential equity rollover arrangements and/or post-closing employment and compensation arrangements. Having disclosed the existence of the June 2022 Guidelines, however, the Proxy fails to disclose any of the guidelines in that document. In particular, it is unclear (i) whether the June 2022 Guidelines authorized discussions concerning the terms of equity rollover arrangements and/or post-closing employment and compensation arrangements between Company management and a potential acquiror, even *before* certain material terms of a transaction with such acquiror had been agreed upon; (ii) to the extent the June 2022 Guidelines restricted discussions concerning the terms of equity rollover arrangements and/or post-closing employment and compensation arrangements between Company management and a potential acquiror, before certain material terms of a transaction with such acquiror had been agreed upon, what were the material terms that had to be first be agreed upon before such discussions could proceed, and (iii) whether the Transaction Committee, the Board, or both, had the power under the June 2022 Guidelines to consent to such discussions between Company management and a potential acquiror.

59. These omissions are material because, on the one hand, on September 2, 2022, the Transaction Committee consented to representatives of Party C and Party C's outside counsel having high-level discussions with certain members of Company management and their respective outside counsel, subject to compliance with the June 2022 Guidelines, regarding the potential terms of rollover arrangements and post-closing employment arrangements that such individuals would consider entering into in connection with a transaction with Party C, even though, at that time, the material terms of a transaction with Party C had *not* yet been agreed upon. Subsequently,

during the rest of September 2022 and October 2022, Party C and Party C's outside counsel, on the one hand, and certain members of Company management and their respective counsel, on the other hand, discussed the structure and principal terms of potential rollover arrangements, even though, at that time, the material terms of a transaction with Party C had *not* yet been agreed upon.

60. Yet, on December 7, 2022, the Board—*not the Transaction Committee*—directed Company management and its financial and legal advisors to continue engaging with EQT in an effort to resolve "the key open points" on the Merger Agreement *prior to consenting*, under the June 2022 Guidelines, to EQT beginning discussions with certain members of Company management on their rollover arrangements and post-closing employment and compensation arrangements.

61. Moreover, on December 14, 2022, Defendant Berkman, in accordance with the June 2022 Guidelines, held a telephone call with a representative of EQT to indicate that based on the parties' resolution of "certain of the discrete issues in the Merger Agreement," Company management would be requesting consent from the Transaction Committee to authorize discussions between EQT and certain members of Company management regarding such individuals' potential rollover arrangements and potential post-closing compensation arrangements. The Proxy fails to disclose, however, (i) what these "discrete issues" were that, once resolved, enabled discussions concerning equity rollover arrangements and potential post-closing compensation arrangements between EQT and Company management to proceed, and (ii) whether those "discrete issues" coincided with the "key open points" on the Merger Agreement that the Board had required to be resolved *prior to consenting* to EQT beginning discussions with certain members of Company management on their rollover arrangements and post-closing employment and compensation arrangements

62. Based on the foregoing, the Proxy provides conflicting information concerning the restrictions, if any, in the June 2022 Guidelines regarding discussions concerning equity rollover arrangements and post-closing employment and compensation arrangements between a potential acquiror and Company management *before* key material terms of a transaction had been agreed upon between the Company and a potential acquiror, and if such restrictions existed, what were the key material terms that had to be agreed upon before consent for such discussions would be granted. The Proxy also fails to make clear whether the Transaction Committee, the Board, or both, exercised power under the June 2022 Guidelines to consent to discussions concerning equity rollover arrangements and post-closing employment and compensation arrangements between a potential acquiror and Company management.

***Material Omissions Concerning the Fairness Opinions***

63. A financial advisor's fairness opinion is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders. Here, the Proxy's presentation of the Fairness Opinions of Citi, Goldman and Barclays improperly failed to disclose certain key information underlying the analyses on which such Fairness Opinions were based. Without this information, as described below, Radius stockholders are unable to fully understand these analyses, and thus are unable to determine what weight to place on the Fairness Opinions of Citi, Goldman and Barclays in determining whether to vote for the Merger. This omitted information, if disclosed, would significantly alter the total mix of information.

64. With respect to Goldman's *Premia Paid Analysis*, the Proxy discloses:

> Goldman Sachs reviewed and analyzed, using publicly available information, the acquisition premia for ***all-cash acquisition transactions announced during the period from January 1, 2013 through February 24, 2023 involving a public company in the TMT sector based in the United States as the target where the disclosed enterprise value for the transaction was greater than $1 billion***. For the entire period, using publicly available information, Goldman Sachs calculated the

> 25th percentile and the 75th percentile premia of the price paid in the 149 transactions relative to the target's last undisturbed closing stock price prior to announcement of the transaction and the target's highest closing stock price during the 52-week period prior to the date of the target's last undisturbed closing stock price. With respect to the target's last undisturbed closing stock price prior to the announcement of the transaction, this analysis indicated an overall premium of 28%, and a 25th percentile premium of 19% and 75th percentile premium of 46% across the entire period. With respect to the target's last undisturbed 52-week high closing stock price prior to the announcement of the transaction, this analysis indicated an overall premium of 6%, and a 25th percentile premium of negative 5% and75th percentile premium of 17% across the entire period. Using this analysis, Goldman Sachs applied a reference range of illustrative premia of 19% to 46% to the undisturbed closing price per share of Class A Common Stock of $11.72 as of February 24, 2023 and calculated a range of implied equity values per share of Class A Common Stock of $13.95 to $17.11.

65. Goldman's *Premia Paid Analysis*, however, fails to provide *any* information concerning the transactions that Goldman analyzed in connection with such analysis, including the dates, the parties, the target enterprise values, and the premium paid in each transaction. These material omissions prevent Radius stockholders from being able to evaluate the validity of Goldman's *Premia Paid Analysis. See In re Celera Corp. S'holder Litig*., 2012 WL 1020471, at *32 (Del. Ch. Mar. 23, 2012) ("as a matter of best practices, a fair summary of a comparable companies or transactions analysis probably should disclose the market multiples derived for the comparable companies or transactions."), *rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012); *Turberg v. ArcSight, Inc*., C.A. No. 5821-VCL, at 43 (Del. Ch. Sept. 20, 2011) (TRANSCRIPT) ("[I]f you were to consider what really constitutes a fair summary, then the background multiples should be in there, just like they're in there when you give them to the board. ... [Y]ou would never see a board book that would go to the board without the background multiples.").

66. With respect to Barclays' *Selected Comparable Company Analysis*, the Proxy discloses that Barclays examined over 30 publicly-traded tower, data center and triple net least REIT companies, and analyzed "(a) each tower company's ratio of EV to (i) its 2022 actual or

estimated ("2022A/E") and 2023 estimated ("2023E") tower cash flows ("TCF") and (ii) its 2022A/E and 2023E earnings before interest, taxes, depreciation and amortization and adjusted for non-recurring items ("EBITDA"); (b) each data center company's ratio of EV to its 2022A/E and 2023E EBITDA; and (c) each triple-net lease REIT's implied capitalization rate, defined as the ratio of next twelve months' ("NTM") net operating income to EV." The Proxy fails to disclose, however, the (i) EV for each of the analyzed companies, and (ii) the relevant multiples for each of the selected companies. *See Celera*, *supra*; *Turberg*, *supra*. To the extent data used in the analysis is public information, "[d]isclosures are not supposed to send stockholders on a scavenger hunt," and "[t]o assume that a stockholder could assemble this information [from multiple public sources] 'would create a 'super' shareholder standard and create almost limitless opportunities for deception of the 'reasonable' shareholder.'" *Goldstein v. Denner*, 2022 WL 1671006, at *25 (Del. Ch. May 26, 2022). The material omissions above prevent Radius stockholders from being able to evaluate the validity of Barclays' *Selected Comparable Company Analysis.*

67. With respect to Citi's *Discounted Cash Flow Analysis*, the Proxy discloses that Citi used a range of discount rates of 7.90% to 8.60%, but fails to adequately disclose how Citi determined that range was appropriate. The explanation that the discount rate range reflected an estimate of Radius's "weighted average cost of capital" is insufficient since it does not disclose the risk free rate, U.S. equity premium, and beta adjustments that Citi used. Ensuring that Citi used an appropriate discount rate in its DCF analysis is material to Radius stockholders since if the discount rate range used by Citi was artificially high, it would have depressed the value ranges generated for Radius's shares. *See In re Topps Co. S'holders Litig*., 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range).

68. With respect to Goldman's *Discounted Cash Flow Analysis*, the Proxy discloses that Goldman used a range of discount rates of 7.90% to 8.70%, but fails to adequately disclose how Goldman determined that range was appropriate. The explanation that the discount rate range reflected an estimate of Radius's "weighted average cost of capital" is insufficient since it does not disclose the risk free rate, U.S. equity premium, and beta adjustments that Goldman used. Ensuring that Goldman used an appropriate discount rate in its DCF analysis is material to Radius stockholders since if the discount rate range used by Goldman was artificially high, it would have depressed the value ranges generated for Radius's shares. *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range).

69. With respect to Barclays' *Discounted Cash Flow Analysis*, the Proxy discloses that Barclays used a range of discount rates of 8.0% to 8.5%, but fails to adequately disclose how Barclays determined that range was appropriate. The explanation that the discount rate range reflected an estimate of Radius's "weighted average cost of capital" is insufficient since it does not disclose the risk free rate, U.S. equity premium, and beta adjustments that Barclays used. Ensuring that Barclays used an appropriate discount rate in its DCF analysis is material to Radius stockholders since if the discount rate range used by Barclays was artificially high, it would have depressed the value ranges generated for Radius's shares. *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range.

70. In sum, the Proxy fails to provide adequate information concerning the inputs used to determine the discount rate ranges in the DCF analyses in the Fairness Opinions.

## CLAIMS FOR RELIEF

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

71. Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

72. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

73. Defendants disseminated a false and misleading Proxy, which made statements that are false and misleading, and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

74. By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

75. Yet, as specified above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy, and/or (ii) omitted

material facts from the Proxy necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Radius stockholders to vote in favor of the Merger. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

76. The material misrepresentations and omissions in the Proxy specified above are material insofar as a reasonable Radius Stockholder would view correction of the misrepresentations and disclosure of the omitted facts specified above as significantly altering the "total mix" of information made available to Radius stockholders.

77. Since, according to the Proxy, Radius cannot consummate the Merger unless the proposal to adopt the Merger Agreement is approved by the affirmative vote of the holders of at least a majority of the outstanding shares of Radius common stock entitled to vote as of the record date, the Proxy soliciting the votes of Radius stockholders is an essential link in the accomplishment of the Merger. Thus, causation is established.

78. Plaintiff and other Radius stockholders have no adequate remedy at law, and are threatened with irreparable harm insofar as Plaintiff and other Radius stockholders will be deprived of their entitlement to cast fully informed votes with respect to the Merger if such material misrepresentations and omissions are not corrected before the Stockholder Vote. Therefore, injunctive relief is appropriate.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

79. Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

80. The Individual Defendants acted as controlling persons of Radius within the

meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and/or directors of Radius, and participation in, and/or awareness of Radius's operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Radius with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that are materially false and misleading, and the omission of material facts specified above.

81. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements that were false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82. Each of the Individual Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Board to approve the Merger, and recommend that Radius stockholders vote for the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

83. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval.

84. By virtue of the foregoing, the Individual Defendants had the ability to exercise control over and did control a person or persons who violated Section 14(a), by their acts and

omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

85. Plaintiff and other Radius stockholders have no adequate remedy at law, and as a result of the Individual Defendants' violations of Section 20(a) of the Exchange Act, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger. Therefore, injunctive relief is appropriate.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty Under Delaware Law

86. Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

87. The Individual Defendants, as directors of a Delaware corporation, owed Plaintiff and other Radius stockholders fiduciary duties of due care, good faith, candor, and loyalty under Delaware law.

88. The Individual Defendants breached their fiduciary duties under Delaware law by omitting material facts from the Proxy that were necessary for Plaintiff and other Radius stockholders to know in order to cast fully informed votes with respect to the Merger.

89. The facts omitted from the Proxy as detailed above were material because there is a substantial likelihood that a reasonable Radius Stockholder would have viewed disclosure of such facts as having significantly altered the 'total mix' of information made available.

90. As a result of the Individual Defendants' breaches of fiduciary duty, Plaintiff and other Radius stockholders will be harmed by being deprived of their right to cast fully informed votes with respect to the Merger.

91. Plaintiff and other Radius stockholders have no adequate remedy at law, and as a result of the Individual Defendants' breaches of fiduciary duty, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger. Therefore, injunctive relief is appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A. Enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to Radius stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

B. Finding Defendants liable for violating Sections 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

C. Finding the Individual Defendants liable for violating Section 20(a) of the Exchange Act, and breaching their fiduciary duties under Delaware law;

D. Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff and other Radius stockholders rescissory damages;

E. Directing Defendants to account to Plaintiff and other Radius stockholders for all damages suffered as a result of their misconduct;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

G. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: May 16, 2023

**WOHL & FRUCHTER LLP**

By: /s *Joshua E. Fruchter*
Joshua E. Fruchter (JF2970)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6588
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*